

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 7, 2014**

**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **JEFFREY TRE KRUEGER,** | § | Case No. 12-40328-RFN-7 |
| | § | |
| Debtor. | § | |

### MEMORANDUM OPINION DISMISSING BANKRUPTCY CASE

There are three motions before the court: creditor Michael Torres's motion to dismiss this case with prejudice; his alternative motion to extend the time for him to object to the debtor's discharge; and, the debtor's motion for entry of his discharge. For the reasons stated herein, the court will grant the motion to dismiss. Because the order of dismissal moots the other two motions, they will be denied.

## I. PROCEDURAL BACKGROUND

### A. The State Court Proceedings

Jeffrey Tre Krueger filed a voluntary petition under chapter 7 in this court on January 18, 2012. Krueger filed in large part to stay certain state court litigation that threatened not only his pecuniary interests but his personal freedom.

The state court litigation involved claims and counterclaims by Krueger and Torres over the ownership and control of Cru Energy, Inc. Krueger and Torres were shareholders in Cru, and each accused the other of attempting to gain control of Cru by, among other things, fraud, manipulation, and breach of fiduciary duty. In the litigation, Krueger and Torres each purported to act on behalf of Cru and, as such, each asserted claims against the other on Cru's behalf.

What already was a confusing lawsuit was made more so when Jorge Zuniga and Green Alt Corporation intervened. According to Zuniga, Krueger, who was also an officer and director of Green Alt, had misappropriated Green Alt's trade secrets and wrongfully transferred them to Cru. Zuniga asked that all of Krueger's interest in Cru be awarded to Zuniga because of Krueger's breaches of fiduciary duty.

The state court was not sympathetic to Krueger. First, on June 14, 2011, the court entered a temporary restraining order that prohibited Krueger from making withdrawals from Cru's bank account at Wells Fargo, except for those transfers made in the ordinary course of business. Then, on July 5, 2011, the court entered a temporary injunction that, among other things: recognized that Torres, not Krueger, was the president of Cru; ordered Krueger not to withdraw any money from Cru's Wells Fargo account; enjoined him from calling a shareholders' meeting on behalf of Cru; and, prohibited him from contacting Cru's investors, potential investors, or employees. The court entered another temporary injunction against Krueger on July

2

15, 2011. That was necessitated because Krueger had withdrawn $160,000 from the Wells Fargo account on July 1, 2011, during the hearing on the first temporary injunction. At the hearing on the second temporary injunction, the court ordered Krueger to return $80,000 of the $160,000 that Krueger had taken from the Wells Fargo account.

At least twice during 2011, the state court entered orders requiring Krueger to appear and show cause why he should not be held in contempt for violating the temporary restraining order and the first temporary injunction. In anticipation of a show cause hearing scheduled for January 19, 2012, Krueger filed this bankruptcy case on January 18, 2012.

Also pending on the date that Krueger filed for bankruptcy was Zuniga's and Green Alt's motion for summary judgment against Krueger. Those parties sought judgment against Krueger based upon deemed admissions because Krueger had failed to respond to their discovery requests.

Krueger's bankruptcy filing raised the question of whether the automatic stay applied to the contempt proceeding. In response to motions filed by each side, this court lifted the stay to permit the contempt action to proceed in state court.

In September 2012, the state court found that Krueger had made three cash withdrawals in violation of the temporary restraining order. The court committed Krueger to three days in jail for his conduct. Later, Cru (under Torres's control) pursued additional contempt charges against Krueger for violating the first temporary injunction. In the second contempt hearing, the state court determined that Krueger had violated the first injunction by making twenty-three additional withdrawals from the Cru bank account and by contacting Cru investors. The court committed Krueger to jail for an additional 125 days, but Krueger served only twelve days after posting bond in connection with a petition for writ of habeas corpus.

In the habeas proceeding, the Texas Court of Appeals for the Third District in Austin vacated the trial court's order of contempt because it found that the first temporary injunction lacked the specificity required by Texas law. The Court of Appeals issued its writ on May 16, 2013, a date whose significance will become apparent below.

### B. The Federal Court Proceedings

The dispute between Krueger and Torres was not confined to state court. In April 2012, Cru (under Torres's control) joined with Zuniga and Green Alt and filed an adversary proceeding in this court to deny Krueger's discharge and to determine that his debts to them were non-dischargeable. Krueger moved to withdraw reference of that adversary proceeding to the District Court. That motion was granted in November 2012.

In February 2013, Krueger reached a settlement with Zuniga that resulted in the dismissal of his and Green Alt's claims against Krueger in the adversary proceeding. That left Cru's claims to deny Krueger's discharge and to determine that his debt to Cru was non-dischargeable. It also left certain claims that Krueger asserted against Torres personally.

On May 21, 2013, five days after the Texas Court of Appeals voided the first injunction, Krueger called for a meeting of Cru's shareholders. The meeting was held on May 31, 2013, and was attended by Krueger, his father, Zuniga, and two other shareholders. At the shareholders' meeting, Torres was removed as a director, and Krueger was re-elected as a director. In the board meeting that followed, the board voted to remove Torres as president and then elected Krueger as chairman of the board, president, and chief executive officer of Cru. It also voted to fire the attorneys who had represented Cru while it was under Torres's control and to sue at least one of those lawyers for malpractice. More importantly, it voted to dismiss all of Cru's claims against Krueger himself.

In an order of July 31, 2013, the District Court noted that Cru no longer had an attorney of record in the adversary proceeding. The District Court advised the parties that it would consider dismissing all claims asserted by Cru unless an attorney entered an appearance on its behalf. Naturally, in light of Krueger's firing of Cru's lawyers and his threats to sue them for malpractice, Cru's former attorneys were reluctant to enter an appearance on Cru's behalf.

Krueger's actions placed Torres in a dilemma. In the adversary proceeding in the District Court, Torres had asserted no personal claims against Krueger. Instead, acting on behalf of Cru, Torres had asserted only claims by Cru against Krueger.

Torres scrambled to respond to the District Court's order. First, he sought to be substituted personally for Cru with respect to the claims against Krueger. Second, he asked to proceed derivatively on behalf of Cru. The District Court denied both motions and, in light of the failure of any attorney to appear on behalf of Cru, dismissed all of Cru's claims against Krueger.

Because the only claims remaining in the adversary proceeding were Krueger's claims against Torres, the District Court referred the adversary proceeding back to this court. In this court, Torres renewed two motions that were filed in the District Court but denied without prejudice. First, Torres moves to dismiss this bankruptcy case with prejudice. Alternatively, he asks this court to extend the time for him to file an objection to Krueger's discharge. Krueger asks the court to deny these motions and enter his discharge.

## II. STANDARDS GOVERNING
## A MOTION TO DISMISS UNDER SECTION 707(a)

Pursuant to Section 707(a), this court may dismiss a case for "cause." While section 707(a) provides three grounds for dismissal of cause, those grounds are merely illustrative, not exclusive. *In re Tanenbaum*, 210 B.R. 182, 185 (Bankr. D.Colo. 1997). Most courts agree that

5

bad faith constitutes a basis for dismissal. *In re Kane & Kane*, 406 B.R. 163, 167 (Bankr. S.D. Fla. 2009); *In re* Carbaugh, 299 B.R. 395, 399 (Bankr. N.D. Tex. 2003); *In re Eddy*, 288 B.R. 500, 504 (Bankr. E.D. Tenn. 2002). Where bad faith is alleged, the court must examine the debtor's conduct in light of the totality of the circumstances. *In re Griffieth*, 209 B.R. 823, 827 (Bankr. N.D.N.Y. 1996). In doing so, the court must construe "cause" narrowly to ensure that such an inquiry is not "employed as a loose cannon which is to be pointed in the direction of a debtor whose values do not coincide precisely with those of the court." *In re Motaharnia*, 215 B.R. 63, 68 (Bankr. C.D. Cal. 1997). Indeed, the court should exercise it discretion to dismiss with prejudice only "in response to fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to the relief available to the typical debtor." *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 374-75 (2007). The evidence presented in this case shows that Krueger is that atypical litigant.

### III. FINDINGS IN SUPPORT OF THE MOTION TO DISMISS

#### A. Krueger's Credibility

In its findings below, the court details many of the ways in which Krueger has shown himself not to be worthy of belief. But, even without those numerous examples of dishonesty, the court still would not find him to be a credible witness. First, as a witness under cross examination, Krueger continually refused to answer questions directly. Even after being admonished by the court to answer the opposing counsel's questions, Krueger repeatedly qualified his answer or otherwise avoided answering the question directly. Not only did this consume an inordinate amount of time while counsel tried to elicit a direct answer from Krueger, but Krueger's evasiveness betrayed the fact that, indeed, he had something to hide. A cold

6

transcript may well reveal that Krueger was vacillating during his testimony, but it could never fully convey his evasive demeanor and lack of believability.

On the other hand, the witnesses who testified against Krueger were credible. This includes Michael Torres, Pablo Cortez, and Rob Cook, all of whom contradicted Krueger on key points.

### B. Krueger's Fast and Loose Conduct In the State Court System

After three days of hearings, it is now possible to piece together how Krueger attempted to manipulate the state and federal court systems in order to gain leverage over, if not cheat, his former colleague Michael Torres. Of course, it is not this court's job to resolve the dispute between Krueger and Torres over who controls Cru. Instead, the dispute serves as background to demonstrate how Krueger attempted to make this court and other courts complicit in his scheme to win control of Cru or, alternatively, migrate its business to another company controlled by Krueger.

First, it is noteworthy that the lawsuit that initiated all of this litigation was based upon a fundamental lie. After Cru was formed, Krueger orally agreed that Torres would hold an equal number of shares in Cru as Krueger. Krueger failed to comply with that agreement, prompting their dispute over share ownership. Ironically, it was not Torres who filed suit over the ownership issue but Krueger himself. In that suit, Krueger alleged and later testified that he had never agreed to equalize share ownership. But Cru employee Rob Cook heard Krueger agree to equalize share ownership with Torres. And, Krueger later admitted to Cru employee Pablo Cortez that he had agreed to make Torres an equal owner.

On July 1, 2011, the state court held a hearing on Cru's request for a temporary injunction against Krueger. As the hearing progressed, Krueger sensed that the judge might

7

enjoin him from making transfers of Cru's money. So, during a recess Krueger used his phone to take the preliminary steps necessary to transfer $160,000 from Cru's Wells Fargo account into his personal account. Just as he feared, the trial judge delivered an oral ruling prohibiting Krueger from transferring Cru's funds. Immediately thereafter, Krueger actuated the telephonic transfer, thus transferring Cru's money into a personal account held by Krueger and his mother. Although Krueger twice testified in this court that he transferred the money before the judge announced her ruling, that testimony is not credible, especially in light of testimony to the contrary by Cortez and Cook.

The state court's oral ruling was implemented by a written temporary injunction entered on July 5, 2011. Based upon legal advice, Krueger understood that he was not bound by the terms of the temporary injunction unless he was formally served with a copy. So, Krueger set about avoiding service of the temporary injunction. He created a false address in Ada, Oklahoma based upon the address of Cru shareholder Wade Duty, but with the wrong street number. Krueger laughed as the process server drove aimlessly around Ada, looking for an address that did not exist. Krueger was finally served with the temporary injunction on October 5, 2011.

Even though Krueger felt that he was not bound by the terms of the order until formally served, he nevertheless felt it necessary to appear as if he had no knowledge of the contents of the injunction before he was served. This was so because Krueger was, in fact, spending Cru's money.

On November 27, 2012, Krueger testified in this court that he intentionally avoided reading the temporary injunction until after being served in October 2011. He reiterated that story on the stand during the trial of the three motions currently before the court. In fact, that

testimony is not true. Shortly after the written injunction was entered on July 5, 2011, Cortez forwarded a copy of it to Krueger via e-mail. Krueger called Cortez minutes later and the two of them went over the injunction line-by-line. Krueger also went over the injunction line-by-line with Cook in mid-July 2011. So, even though Krueger had actual knowledge of the terms of the injunction by mid-July 2011, he made substantial transfers of Cru's money between that time and the date he was served.

### C. Krueger's Creation of Kru To Avoid the State Court Injunction

After being formally served with the injunction on October 5, 2011, Krueger could no longer feign ignorance of it terms. One of the terms that most concerned him was the one that precluded him from contacting investors or potential investors on behalf of Cru. Krueger found an answer for this.

On October 17, 2011, less than two weeks after being served with the temporary injunction, Krueger formed a new company called Krueger Renewable Utilities, Inc. ("Kru"). The similarities between Cru and Kru are striking. First, for the most part, persons who were shareholders of Cru were made shareholders of Kru. This coincidence is even more remarkable in light of the fact that most of Kru's shareholders were not informed they were shareholders of Kru. For example, Rob Cook was not made aware that he owned 750,000 shares of Kru until February 11, 2014, when Krueger so informed him during a break in Cook's testimony in these matters.

There were, however, notable differences between the shareholder lists of Cru and Kru. First, neither Krueger nor Torres was made a shareholder of Kru. Instead, Krueger's parents were made the controlling shareholders of Kru, even though neither of them contributed anything of substance to that company. Second, even though he owned no shares in Kru himself, Krueger

9

was given the right to veto any transfer of shares that would transfer control of the company from his parents. Not surprisingly, Kru's board elected Krueger chairman of the board, chief executive officer, and president.

It would be an understatement to say that Kru's business was similar to Cru's business. In fact, they were the same. Cru's business was the development of biogas and fertilizer. So was Kru's. Cru planned to build a biogas facility in Ada, Oklahoma. So did Kru. But, Krueger was not satisfied with merely duplicating Cru's business. Instead, under Krueger's control, Kru appropriated all of Cru's intellectual property and business plans. Indeed, even information that was subject to confidentiality agreements between Cru and third parties was appropriated by Kru.

Krueger took Cru's business plans, confidential information, and business proposals and submitted them to prospective investors. The list of prospective investors included former Cru investors Steve Baxter, Justin Jackson, and Mark Williams, as well as new investors such as Jerry Setliff. So blatant was Krueger's misappropriation that he actually took Cru's documents, rebranded them under the name of Kru, and sent them to Setliff.

### D. Krueger's Failure To List His Positions With Kru In His Statement of Financial Affairs

Krueger filed his statement of financial affairs with this court on January 20, 2012. In response to question number 18.a. requiring him to list those companies in which he had been an officer or director during the past six years, Krueger did not mention Kru. Instead, his response was "none."

Krueger contends that he thought that he was only required to disclose such positions if he had an ownership interest in the company. That is not credible. First, question 18.a. is not ambiguous or vague. Second, Krueger's purported understanding that he need not disclose those

positions unless he was also a shareholder is belied by the fact that he also did not disclose his affiliations with Cru, where he was both a director and a shareholder.

Moreover, Krueger's actions in regards to Kru belie any assertion that his omission of his affiliation with that company was mere oversight. After incorporating Kru in October 2011, Krueger took significant efforts to raise capital on its behalf. Acting as "president" of Kru, Krueger sent hundreds of pages of investment materials to Jerry Setliff in December 2011. He convened the first meeting of shareholders of Kru on January 9, 2012, just nine days before he filed for bankruptcy. On January 19, 2011, one day *after* filing his bankruptcy petition and one day *before* filing his statement of financial affairs, Krueger, again acting as president of Kru, sent a quote for certain site and digester designs to Setliff. As these facts demonstrate, Krueger's affiliation with Kru was not circumstantial, it was material. And, his omission of his affiliation with Kru cannot be ascribed to negligence.

### E. Krueger's Failure To Schedule His Interest in Kru

The logical conclusion to be drawn from Krueger's dealings with Kru is that Krueger was the de facto owner of the controlling interest in Kru when he filed his bankruptcy petition. Although Krueger seems to suggest that Kru had no value when he filed, that after-the-fact, self-serving assessment is belied by the considerable work he performed on Kru's behalf both before and after bankruptcy.

Krueger's attempts to solicit a significant investment from Setliff have been noted previously. In August 2012, he convinced Kyle Fair to contribute some $60,000 in real estate and operating costs to a company called Kru Agrigas, LLC, in which Kru held a 49% interest. Then, in November 2012, Krueger convinced Barry Parsley to invest $576,000 for 600,000 shares in Kru.

11

Krueger successfully convinced others that Kru was worth hundreds of thousands, if not millions, of dollars. Yet, he did not list his interest in Kru in his schedule of assets. That is because he intended to hide that interest from Torres and, most likely, from the trustee and this court as well.

### F. Krueger's Violations of the Automatic Stay

After the Texas Court of Appeals vacated the state court's contempt order, Krueger immediately called a shareholders' meeting for Cru. The shareholders, ostensibly controlled by Krueger and his parents, removed Torres as director and elected Krueger to the board. The board elected Krueger as president and chief executive officer. It then voted to fire Cru's lawyers, sue them for malpractice, and dismiss Cru's claims against Krueger himself.

By voting his shares in Cru, Krueger was exercising control over property of his bankruptcy estate. As a chapter 7 debtor, Krueger had no right to do this. Although Krueger claims that he had the right to exercise all of the rights of share ownership unless and until the trustee demanded turnover of his stock, this court knows of no authority for that position. Section 362(a)(3) unambiguously precludes such control by a chapter 7 debtor, and the facts of this case demonstrate why.

Krueger, by voting his shares and ultimately exercising control over Cru, caused it to dismiss all claims against him, including Cru's claims for return of the $80,000 that he took out of Cru's bank account. Those claims must have had at least the nuisance value they represented to Krueger. Additionally, Krueger's control of Cru permitted him to impede any efforts on behalf of Cru to pursue him for wrongfully appropriating Cru's business for the benefit of Kru.

By eliminating or impeding Cru's colorable claims against himself, Krueger arguably reduced the value of the Cru stock, and, thus, the value of the estate's interest in the Cru stock.[1]

Krueger's stay violations were not limited to his exercise and control over the Cru stock. In the District Court litigation, Krueger asserted claims against Torres personally. Those claims were based upon pre-petition conduct by Torres and, as such, were property of Krueger's estate. Krueger cannot deny that his claims against Torres are property of the estate because he listed them as an asset in his schedules. Even though he listed the value of those claims as "unknown," he noted that he sought to recover $2.3 million from Torres. Nevertheless, Krueger never sought this court's authorization to pursue those claims in the District Court.

### G. Krueger's Use of a False Address In His Bankruptcy Petition

Like the state court litigation, this bankruptcy case was commenced by Krueger's employment of a fundamental deception. When Krueger filed his petition, he listed his address as 3112 Grapevine Mills Blvd., Apt. 4114, Grapevine, Texas. No such address exists.

At trial, Krueger testified that this was an honest mistake. He said that he had attempted to give his wife's address, where he stayed some of the time and intended to live. Krueger's wife's address was 3225 Grapevine Mills Blvd., not 3112. And, her apartment number was 3114, not 4114. Krueger's testimony raises many logical questions, not the least of which is why Krueger couldn't simply ask his wife for her address.

The address given by Krueger in his petition was close enough for him to deny an intention to mislead, but wrong enough to be worthless. This was no mistake. Krueger did exactly the same thing in the state court litigation when he used Duty's real address, modified it by a few digits, and then laughed as process servers struggled to find him.

---

[1] The court authorized the trustee to sell the estate's interest in Cru and Kru to Krueger's father for $40,000, but that was after Krueger caused Cru to dismiss the claims against him.

Krueger's misdirection when it comes to his address has a purpose. As his conduct in response to the temporary injunction confirms, Krueger does not feel bound by court orders unless he is formally served with them. Moreover, the use of a false address permits Krueger to deny that he has been served with things like motions and complaints. That is significant in this case because Krueger claimed to represent himself, meaning that service on his lawyer would not effect service on him personally. Although Krueger did appear at hearings with counsel from time to time, it was always noted that his counsel's appearance was for that discrete matter only and did not constitute a general appearance.

### H. Krueger's Perjury and False Oaths In This Case

Krueger has repeatedly perjured himself in this court. His perjurious testimony includes, but is not limited to: testifying that he never agreed to equalize share ownership with Torres; testifying that he transferred the $160,000 before the state court judge handed down the temporary injunction; testifying that he did not know the terms of the injunction until it was served on him in October 2011; testifying that he did not know that he was required to list his positions with Kru in his statement of financial affairs; and, testifying that he made an honest mistake when he listed an inaccurate address on his bankruptcy petition. This perjured testimony was material to the resolution of the matters before the court and, by itself, would warrant dismissal of his case with prejudice.

In addition to the false address on his bankruptcy petition, Krueger's bankruptcy filings also were materially false in that he: failed to list his de facto interest in Kru on his schedule of assets; failed to list his positions with Cru, Kru, and Green Alt in response to question 18.a. of his statement of financial affairs; and, filed a false declaration on February 21, 2012, in which he

testified that he transferred Cru's money before the state court judge handed down her ruling on the temporary injunction.

### I. Krueger's Threat to a Witness During These Proceedings

Pablo Cortez testified adversely to Krueger during the hearing on the motions before the court. As noted previously, the court found Cortez to be credible. It also found his testimony to be compelling. Apparently, Krueger found it equally compelling. During a break from Cortez's testimony, Krueger approached Cortez in the hallway and said, "You're next, buddy. I'm going to sue the . . . out of you." The court construes this not just as a breach of decorum, but as an attempt by Krueger to intimidate Cortez and, perhaps, influence his testimony.

### J. Other Factors Bearing on the Decision To Dismiss

The foregoing facts show that Krueger is the atypical litigant who is not entitled to the same bankruptcy protection as the typical debtor. But, of course, the court must consider the totality of the circumstances of this case when weighing dismissal with prejudice.

The considerations that mitigate most against dismissal of this case are the passage of time and the trustee's administration of the estate for the past two years. Among other things, the trustee has sold Krueger's interest in Cru and Kru to Krueger's father for $40,000. And, there are three remaining creditors besides Torres whose claims could be paid in full if this case were to be fully administered.

The court can deal with matters of estate administration through appropriate orders. For example, it can ensure that the trustee receives her commission and that her professionals are paid. It can ensure that creditors whose claims are not disputed are paid. The court can provide that the order authorizing the sale of Krueger's interest in Cru and Kru remains in effect. The court will take these actions.

Still, Krueger argues that Torres's motion to dismiss is simply too late. He argues that almost every act posited as a ground for dismissal has been known by Torres since the filing of this case. While many of the things that Torres complains of were known early on, the magnitude of Krueger's use of Kru to steal Cru's business has only recently been revealed. Moreover, and perhaps more importantly, much of Krueger's perjurious testimony occurred at trial on the motion to dismiss.

In any event, the focus on what Torres knew and when he knew it is misplaced. The court does not grant the motion to dismiss solely to vindicate Torres's rights, but to vindicate the rights of all honest debtors who come before this court. All too often, bankruptcy is portrayed as a system where dishonest debtors go to hide from legitimate creditors. Although exceptions exist, that is not this court's experience. But, Krueger's conduct in this case bolsters the arguments of bankruptcy's critics. Krueger has played fast and loose with this court, just as he did with the state court. The court should not, and will not, abide his attempt to manipulate the court system of this country for dishonest purposes. It will dismiss his case with prejudice to refiling for two years. The other motions before the court will be denied because they are mooted by the order of dismissal.

# # # END OF MEMORANDUM OPINION # # #